1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHARLES E. JONES,

11          Petitioner,                          No. CIV S-09-2664-MCE-TJB

12          vs.

13   KATHY DICKINSON,

14          Respondent.                          FINDINGS AND RECOMMENDATIONS

15   _____/

16                              I. INTRODUCTION

17          Petitioner Charles E. Jones is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that

19   the petition be denied.

20                          II. PROCEDURAL HISTORY

21          Petitioner is currently serving a life sentence, with the possibility of parole, for kidnaping

22   to commit robbery, attempted carjacking, and second degree robbery. *See* Pet'r's Pet. 1, ECF

23   No. 1; Resp't's Answer Ex. 2, pt. 1, at 85, ECF No. 14. In the instant action, Petitioner

24   challenges the decision by the California Board of Parole Hearings (the "Board") denying

25   Petitioner parole. Petitioner appeared before the Board on August 21, 2008.

26          In 1998, a Los Angeles County jury convicted Petitioner of three counts:  (1) kidnaping to

1

1  commit robbery; (2) kidnaping during the commission of carjacking; and (3) second degree
2  robbery. *See* Pet'r's Pet. 1; Resp't's Answer Ex. 2, pt. 1, at 93. For kidnaping to commit
3  robbery, Petitioner was sentenced to "life with the possibility of parole, with the minimum parole
4  eligibility date of 19 years (7 years doubled to 14 years pursuant to the Three Strikes law, plus a
5  5-year enhancement pursuant to [California Penal Code] section 667, subdivision (a)(1))."
6  Resp't's Answer Ex. 2, pt. 1, at 93. The same sentence was imposed for kidnaping during the
7  commission of carjacking "but was stayed pursuant to section 654." *Id.* For second degree
8  robbery, Petitioner was sentenced to "one-third the middle term of three years, or one year, which
9  sentence was doubled to two years pursuant to the Three Strikes law," and was also stayed. *Id.*
10  On October 5, 1999, the California Court of Appeal, Second Appellate District, (1) modified the
11  conviction for kidnaping during the commission of carjacking to attempted carjacking and
12  remanded the matter for resentencing; and (2) remanded "to the trial court for retrial of the prior
13  serious felony enhancement and strike allegation, and for resentencing in the event the prior
14  serious felony allegation is not proved." Resp't's Answer Ex. 2, pt. 2, at 18. The California
15  Supreme Court summarily denied the appeal. *People v. Jones*, No. S083493, 2000 Cal. LEXIS
16  82, at *1 (Cal. Jan. 13, 2000).

17  At the hearing on October 5, 2000,[1] Petitioner was resentenced to life with the possibility
18  of parole for kidnaping to commit robbery. Resp't's Answer Ex. 2, pt. 1, at 85. The "previous
19  sentence as to penal code section 667(a)(1) is vacated." *Id.* For attempted carjacking, Petitioner
20  was also resentenced to life with the possibility of parole, which was stayed. *Id.* For second

21

22  [1] At the time of the hearing, the California Supreme Court summarily denied review of
*People v. Mitchell*, 81 Cal. App. 4th 132, 96 Cal. Rptr. 2d 401 (2000), where the California Court
of Appeal held that "res judicata principles" applied and "preclude[d] retrial" of priors. 81 Cal.
23  App. 4th 132, 156, 96 Cal. Rptr. 2d 401 (2000), *appeal denied*, 2000 Cal. LEXIS 7303, at *1
(Cal. Sept. 13, 2000), *overruled by People v. Barragan*, 32 Cal. 4th 236, 259, 9 Cal. Rptr. 3d 76,
24  83 P.3d 480 (2004) ("We reverse the judgment of the Court of Appeal insofar as it prohibits
retrial of the alleged prior . . . ."). Because the California Supreme Court denied review of
25  *Mitchell*, the People admitted they were "out of the water with regards to the priors." Resp't's
Answer Ex. 3, pt. 2, at 25; Resentence Hr'g Tr. 3, Oct. 5. 2000. Thus, Petitioner was only
26  resentenced and not retried. Resp't's Answer Ex. 3, pt. 2, at 23-26; Resentence Hr'g Tr. 3.

2

1 degree robbery, Petitioner was resentenced to one-third the middle term for one year, which was

2 also stayed. *Id.* The "previous sentence pursuant to penal code section 1170.12(a)-(d) is

3 reversed and vacated." *Id.* Nothing in the record before this Court indicates whether this

4 resentencing was appealed.

5    On February 11, 2009, Petitioner filed a petition for writ of habeas corpus with the Los

6 Angeles County Superior Court challenging the Board's denial of parole. *See* Resp't's Answer

7 Ex. 1, at 4-31. On February 17, 2009, the Superior Court issued a "minute order" denying the

8 petition because "the petition does not have a proof of service indicating that all parties have

9 been served." *Id.* at 2. On March 13, 2009, Petitioner sought relief in the California Court of

10 Appeal, Second Appellate District. *See* Resp't's Answer Ex. 2, pt. 1, at 3-97; Resp't's Answer

11 Ex. 2, pt. 2. On March 20, 2009, the California Court of Appeal issued a reasoned opinion

12 denying the petition. *See* Resp't's Answer Ex. 2, pt. 1, at 2. Petitioner also sought relief in the

13 California Supreme Court, *see* Resp't's Answer Ex. 3, pt. 1, at 3-94; Resp't's Answer Ex. 3, pt.

14 2, which denied the petition without a written opinion. *See* Pet'r's Pet. 8.

15    On September 23, 2009, Petitioner filed the instant federal petition for writ of habeas

16 corpus. Respondent filed an answer to the petition on January 19, 2010, to which Petitioner filed

17 a traverse on February 11, 2010.

18    ## III. FACTUAL BACKGROUND

19    At 11:50 a.m. on November 7, 1997, Miranda Watkins drove her
      Mustang to Charter Oak High School to meet her boyfriend for

20    lunch. She parked facing a football field and walked across the
      parking lot to her boyfriend's truck. As she was parking, she

21    noticed a man, whom she later identified as appellant, wearing a
      long-sleeved shirt, long pants, and a hat. She waited at her

22    boyfriend's truck for about 10 minutes, then walked back to her
      car, and set the alarm.

23
      She walked back to the truck and turned around to see appellant

24    standing right behind her. Appellant grabbed her, she screamed,
      and he put his gloved hand over her mouth and cursed at her,

25    telling her to shut up. She was holding in one hand her keys and
      her wallet with her pager clipped onto it. Appellant knocked her to

26    the ground, still cursing at her and holding his hand over her

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

mouth. She struggled somewhat but could not scream because his hand was over her mouth. He told her to get up, but she said she could not because he was putting so much pressure on her mouth. He picked her up and took her wallet, keys, and pager from her. He walked her directly to her car without asking which one was hers. She estimated the distance between her boyfriend's truck and her car was about 40 feet. She said, "Please don't hurt me, just take everything." Appellant replied, "'I plan on it.'"

When they reached the car, appellant put Watkins's wallet on top of the car and tried to unlock the door. He could not get the door open, and told her to do it. She told him the alarm was on, but he did not reply. She unlocked the door, he opened it, and the alarm sounded. He told her to turn it off, and she attempted to do so by pushing an alarm button on her key chain, but she could not turn it off because the button tended to malfunction. He had put his hand over her eyes and she told him she could not see. He moved his hands back over her mouth, then pushed her inside the car. Watkins knew that if she tried to start the car, the battery would die and the alarm would stop. She turned the key in the ignition and heard the battery click as if dead and the alarm stopped. The alarm had been sounding for just less than one minute. Appellant told her to move over to the passenger side and began getting into the driver's side of the car. As he did, she moved to the passenger's side, opened the door, and got out. He grabbed for her but did not touch her.

Watkins screamed and ran to the door of the school's cafeteria building. A cafeteria employee came out and asked what was wrong. Watkins said, "A man attacked me," pointing toward the parking lot where appellant was walking away. Watkins testified that although the lot was full of parked cars, she had not seen any other people in the parking lot.

Linda Seal, a food service supervisor at the high school, testified she ran outside when she heard screaming in the parking lot. Watkins ran toward her screaming for help, saying, "'That man is trying to get me.'" Watkins pointed toward a man walking in the parking lot. Seal saw a "very large, Black man" wearing slacks, a hat, and a long-sleeved shirt; he looked directly at Seal from a distance of about 40 feet. Seal and Watkins ran into Seal's office.

Larry Pisani, a school counselor, had just pulled into the parking lot. Seal told him a girl had been attacked in the parking lot and the attacker was walking toward the park. When Pisani entered the parking lot, he had seen Watkins run past his car, screaming, toward Seal. Pisani began following on foot the man Seal had pointed out. He followed appellant from a distance of 15 to 20 feet, asking Johnny Brandt, a student who had pulled into the parking lot, to come with him.

4

Case 2:09-cv-02664-MCE-TJB Document 18 Filed 09/15/10 Page 5 of 28

Appellant began to run across Covina Boulevard, then stopped and turned toward Pisani and Brandt. Pisani testified appellant said, "'Do you guys want to play?'" Brandt heard him say, "'Do you want drama? Is this what you want?'" Appellant reached behind his back and Pisani cowered, thinking appellant was reaching for a weapon. Appellant came toward Pisani and threw a punch at him with a gloved fist but did not hit him. Appellant then began to run toward Brandt. When two other people carrying walkie-talkies approached, appellant turned and began walking toward the park again.

Ronald Letourneau, an assistant principal, was told by a woman named Janet Caraway that a student had been assaulted in the parking lot. Letourneau ran to the cafeteria where he was told by Seal what had happened. He went outside and a school proctor, Lupe Lorenzo, pointed to the northeast area of the parking lot. Letourneau saw Pisani in the parking lot and appellant in the middle of Covina Boulevard. Letourneau ran toward appellant and told him to stop but he instead walked toward the park. Letourneau called Covina Police Officer Dan Jacobs on his walkie-talkie.

Jacobs, the Charter Oak High School resource officer, received a call over his school radio that a female had been attacked in the parking lot. He walked toward the parking lot and saw Letourneau waving his hands over his head. Jacobs heard Letourneau speaking over the walkie-talkie, indicating that appellant, whom Jacobs could also see, was the one who attacked the girl. Jacobs got into his patrol car and drove toward the park, pulling up near appellant. He turned on his overhead lights and sounded his air horn, but appellant continued walking away. Jacobs got out of his car, drew his gun, and ordered appellant to stop two or three times before appellant did so. Other police officers began arriving and appellant was handcuffed. Letourneau had seen appellant throw an object away from him, and the object was later discovered to be a wallet containing identification in Watkins's name.

Jacobs went back to the school and spoke to Watkins. Jacobs then drove Watkins to the park in his police car to see if she could make a positive identification of appellant. On the way there, Jacobs told Watkins "that just because there's police officers around an individual, that maybe the individual is handcuffed, that I wanted her to make a positive and be sure that this was the person that had attacked her in the parking lot." When Watkins saw appellant, she said, "Yes, that's him." She began to cry and slumped down in the car.

Watkins had stated her wallet, keys, pager, and bracelet were missing. She had a burn mark on her face which she believed was caused by appellant's tight grip around her mouth with his gloved hand, and she had scratches on her arm.

5

1

2

> Seal went to Watkins's car and found the passenger door open; she removed the keys from the ignition. Seal found Watkins's pager about 20 feet from the car and her bracelet "fairly near" the car.

3

Appellant did not testify or call any witnesses.[2]

4 Petitioner claimed he "ran away as a child" when he was 12 years old, and brought

5 himself up "in the streets of New York and Pennsylvania." Resp't's Answer Ex. 2, pt. 2, at 41;

6 Parole Hr'g Tr. 13, Aug. 21, 2008. At the age of 17 or 18, Petitioner was adopted by a

7 "millionaire" family currently living in Denver, Colorado. Resp't's Answer Ex. 2, pt. 2, at 41;

8 Parole Hr'g Tr. 13. His adoptive father used to own a "retail cards and gifts store" but "sold

9 them out." Resp't's Answer Ex. 2, pt. 2, at 43; Parole Hr'g Tr. 15. Now, Petitioner's adoptive

10 "family . . . ha[s] a law firm." Resp't's Answer Ex. 2, pt. 2, at 41; Parole Hr'g Tr. 13. "It's

11 Hatch Jacobs." Resp't's Answer Ex. 2, pt. 2, at 43; Parole Hr'g Tr. 15. Petitioner's adoptive

12 father is "retired" but "hangs on and oversees the boys and girls." Resp't's Answer Ex. 2, pt. 2,

13 at 44; Parole Hr'g Tr. 16. Petitioner has four sons, two that were located in Denver, one in

14 California, and another in Reston, Virginia. Resp't's Answer Ex. 2, pt. 2, at 42; Parole Hr'g Tr.

15 14. Petitioner alleged he "periodically" contacted his family, but because he taught "law," his

16 "energy . . . doesn't allow [him] to write on a regular basis." Resp't's Answer Ex. 2, pt. 2, at 42;

17 Parole Hr'g Tr. 14.

18 At the hearing, Petitioner did not submit any letters from family in support for release

19 because he did not want to "frustrate" them if he were not paroled. Resp't's Answer Ex. 2, pt. 2,

20 at 45-46; Parole Hr'g Tr. 17-18. Petitioner admitted his adoptive father "chose to believe" that

21 Petitioner "had to have done something" since he was not paroled previously "for the amount of

22 time [Petitioner] did." Resp't's Answer Ex. 2, pt. 2, at 45; Parole Hr'g Tr. 17. Petitioner did

23

24 [2] These facts are derived from the California Court of Appeal's opinion issued on October 5, 1999. *See People v. Jones,* 75 Cal. App. 4th 616, 621-24, 89 Cal. Rptr. 2d 485 (1999).

25 Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th

26 Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

6

1 present one letter from "Ms. Sams," who allegedly discovered that Petitioner was "number two
2 to be transferred" from California to Colorado. Resp't's Answer Ex. 2, pt. 2, at 47; Parole Hr'g
3 Tr. 19.

4 Prior to his "life crime," Petitioner asserted he "owned a corporation called Mardi Gras
5 New Orleans Barbeque Sauce." Resp't's Answer Ex. 2, pt. 2, at 40-41; Parole Hr'g Tr. 12-13.
6 He also maintained that his "forte" was "marketing and advertisement." Resp't's Answer Ex. 2,
7 pt. 2, at 41; Parole Hr'g Tr. 13. He stated he "was a business agent for the AFL CIO" and
8 handled grievances. Resp't's Answer Ex. 2, pt. 2, at 41; Parole Hr'g Tr. 13. Petitioner also
9 mentioned he had experience in "business law, corporate law, [and] non-profit organizations"
10 because of his family. Resp't's Answer Ex. 2, pt. 2, at 41; Parole Hr'g Tr. 13.

11 IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

12 An application for writ of habeas corpus by a person in custody under judgment of a state
13 court can be granted only for violations of the Constitution or laws of the United States. 28
14 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*
15 *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).
16 This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,
17 the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521
18 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under
19 AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in
20 state court proceedings unless the state court's adjudication of the claim:

21         (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
22         determined by the Supreme Court of the United States; or

23         (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
24         State court proceeding.

25 28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*
26 *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

7

1    In applying AEDPA's standards, the federal court must "identify the state court decision
2  that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).
3  Where more than one state court has adjudicated a petitioner's claims, a federal habeas court
4  analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)
5  (finding presumption that later unexplained orders, upholding judgment or rejecting same claim,
6  rests upon same ground as prior order)). Thus, a federal habeas court looks through ambiguous
7  or unexplained state court decisions to the last reasoned decision to determine whether that
8  decision was contrary to or an unreasonable application of clearly established federal law. *Bailey*
9  *v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a
10  federal court believes the state court's determination was incorrect but whether that
11  determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550
12  U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). When no state court
13  reached the merits of a claim, the federal court must review that claim de novo. *See Chaker v.*
14  *Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005), *cert. denied*, 547 U.S. 1128 (2006) (applying de
15  novo standard of review to claim in habeas petition that was not adjudicated on merits by state
16  court); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (same); *Pirtle v. Morgan*, 313 F.3d
17  1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a
18  properly raised issue, we must review it de novo.").

19                                        V. CLAIMS FOR REVIEW

20       Petitioner claims that the Board's parole denial violated his right to equal protection and
21  due process[3] for two reasons. Pet'r's Pet. 4. First, Petitioner contends that he should have been
22  granted parole because "the time served had exceeded the required punishment in the matrix

23

24   [3] Specifically, Petitioner alleges that the Board violated (1) his "due process" rights and
    "liberty interest" under article I, sections 7 and 15 of the California Constitution; and (2) the Due
    Process Clause of Fourteenth Amendment. Pet'r's Pet. 4. Section 7 states, in pertinent part, that
25   "[a] person may not be deprived of life, liberty, or property without due process of law . . . ."
    Cal. Const. art. I, § 7. Section 15 also provides, in pertinent part, that "[p]ersons may not . . . be
26   deprived of life, liberty, or property without due process of law." *Id.* § 15.

8

1  (base term)." *Id.* (internal quotation marks omitted).  Second, Petitioner argues that the Board

2  improperly applied the "some evidence" standard.  *Id.* (internal quotation marks omitted).  For

3  the following reasons, Petitioner's allegations lack merit.

4      A. Equal Protection Claim

5          1. Exhaustion

6          Respondent contends that Petitioner failed to exhaust his equal protection claim.

7  Respondent admits that Petitioner exhausted his state court remedies regarding his claim that the

8  Board's 2008 decision "is unsupported by the evidence and violated his due process rights."

9  Resp't's Answer ¶ 5.  Respondent then makes a lone statement denying that Petitioner exhausted

10  his claims "to the extent they are interpreted more broadly to encompass any systematic issues

11  beyond" that.  *Id.*  Since Petitioner also alleges that his right to equal protection was violated

12  because "the time served had exceeded the required punishment," Pet'r's Pet. 4, Respondent

13  implies that Petitioner failed to exhaust his equal protection claim.  Because exhaustion is a

14  procedural defect that could prevent consideration of any of the claims in the current petition,

15  *Rose v. Lundy*, 455 U.S. 509, 522 (1982) ("[W]e hold that a district court must dismiss habeas

16  petitions containing both unexhausted and exhausted claims."), the exhaustion issue is addressed

17  prior to addressing the claim's merits.

18          a. Legal Standard for Exhaustion of the Equal Protection Claim

19          "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

20  state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon

21  and correct' alleged violations of prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

22  (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts

23  have been given a sufficient opportunity to hear an issue when the petitioner has presented the

24  state court with the issue's factual and legal basis." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th

25  Cir. 1999) (citing *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404,

26  1411-12 (9th Cir. 1998) (factual basis)).  "A petitioner has satisfied the exhaustion requirement

9

if: (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it, . . . or (2) he demonstrates that no state remedy remains available."[4] *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).

To have exhausted via the first avenue, a petitioner must have presented each federal claim as a federal claim to the California Supreme Court on (1) direct review (e.g., in a petition for review); or (2) collateral review (e.g., in a petition for a writ of habeas corpus). *See Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1990); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a] federal claim to the state courts, [a petitioner] had to alert the state courts to the fact that he was asserting a claim under the United States Constitution." (citing *Duncan*, 513 U.S. at 365-66)). A "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." *Duncan*, 513 U.S. at 366. In addition, "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial," do not exhaust a claim. *Hiivala*, 195 F.3d at 1106 (citing *Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.")); *see Johnson*, 88 F.3d at 830-31 (finding petitioner's general reference in state proceedings to alleged violations of his "right to present a defense and receive a fair trial" did not satisfy specificity required for exhaustion); *see also Shumway v. Payne*, 223 F.3d 982, 987-88 (9th Cir. 2000) (holding petitioner's bare reference to "due process" was insufficient to have stated federal claim).

---

[4] A claim is considered exhausted "'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also Valerio v. Crawford*, 306 F.3d 742, 770 (9th Cir. 2002) ("[T]he claim is exhausted because it is procedurally barred." (citing *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir. 2001) ("The district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'") (citation omitted))). Since Petitioner satisfied the "fair presentation" exhaustion avenue, *see infra* Part V.A.1.b, the alternative procedural bar analysis is not reached.

1    The Equal Protection Clause of the federal Constitution's Fourteenth Amendment states
2 that no state shall "deny to any person within its jurisdiction the equal protection of the laws."
3 U.S. CONST. Amend. XIV, § 1. The Fourteenth Amendment's Equal Protection Clause "is
4 essentially a direction that all persons similarly situated should be treated alike." *Cleburne v.*
5 *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To assert a claim under the Equal Protection
6 Clause, a petitioner must show that he was similarly situated to other defendants who received
7 preferential treatment. *See Fraley v. Bureau of Prisons*, 1 F.3d 924, 926 (9th Cir. 1993); *see also*
8 *McQueary v. Blodgett*, 924 F.2d 829, 834-35 & n.6 (9th Cir. 1991).

9                b. Fair Presentation

10    Federal courts are highly protective of a pro se petitioner's rights. For this reason, the
11 district court is required to liberally construe a pro se petition. *Haines v. Kerner*, 404 U.S. 519,
12 520 (1972); *Tatum v. Christensen*, 786 F.2d 959, 963 n.4 (9th Cir. 1985). Accordingly,
13 Petitioner has exhausted his equal protection claim in the state courts because Petitioner's state
14 habeas petitions alleged more than the "broad constitutional principle" of equal protection.
15 *Hiivala*, 195 F.3d at 1106.

16    Under a liberal reading of Petitioner's state habeas petitions, Petitioner argued in his state
17 habeas petitions that by failing to set a release date under the matrix which applied to his crime,
18 the Board violated his equal protection rights by making him serve a sentence longer than that
19 proscribed for similar crimes. On February 11, 2009, Petitioner used a form petition[5] to file his
20 state habeas petition, pro se, in the Superior Court. *See* Resp't's Answer Ex. 1, at 4-31. Where
21 Petitioner was to write his "grounds for relief," Petitioner typed, *inter alia*, that "[his rights]
22 under the Equal Protection Clause . . . were deprived . . . because[] the BPH- Board of Prison
23 Hearing's denial of parole to petitioner[] was unfounded." *Id.* at 6 (internal quotation marks
24 omitted).

25
26    [5] The form petition is "approved by the Judicial Council of California for use under Rule 8.380 of the California Rules of Court . . . ." Resp't's Answer Ex. 1, at 4.

11

1    Behind the section where Petitioner was to provide supporting facts and cases, Petitioner
2  attached 21 pages. *See id.* at 6-27. Among other things, Petitioner alleged that the Board
3  incorrectly recounted his sentence, as the Board stated that his sentence was "a term of life, plus
4  five-years," when it was "actually life with the possibility of parole." *Id.* at 7 (internal quotation
5  marks omitted); *see supra* Part II. Petitioner also asserted that he "qualified" for parole because
6  "the base term of the matrix[] had expired it's [sic] duration." Resp't's Answer Ex. 1, at 11.
7  According to Petitioner, "under the new-law [CAL. PENAL CODE § 3041(a)-(b),] the prisoner
8  must be released upon expiration of the term." *Id.* at 17 (internal quotation marks omitted). As
9  well, Petitioner contended that "because the base term of the matrix[] had expired . . . for
10  knidnap/robbery [sic]," and the Board failed to "set a parole release date," his sentence "is the
11  equivalency" to one for "murder" under Title 15, "§ 2402/§ 2403," of the California Code of
12  Regulations. *Id.* at 11-12 (internal quotation marks omitted); *cf. McQueary*, 924 F.2d at 835
13  (reviewing alleged equal protection violation where petitioner claimed "state felons have
14  allegedly received sentences more lenient than his for offenses more serious than his").

15    On February 17, 2009, the Superior Court denied the state habeas petition because "the
16  court cannot entertain the petition without proof of service on the necessary parties." *See*
17  Resp't's Answer Ex. 1, at 2. The Superior Court did not address any of the claims on their
18  merits. *See id.*

19    Petitioner filed an appeal, pro se, in the California Court of Appeal on March 13, 2009,
20  and did not use a form petition. *See* Resp't's Answer Ex. 2, pt. 1, at 3-6. Instead, he typed four
21  pages as his "petition for writ of mandate/prohibition." *See id.* In these four pages, Petitioner
22  mentioned the Equal Protection Clause twice. *See id.* at 3, 6. First, Petitioner claimed his rights
23  under the Equal Protection Clause, among others, were violated "when the petitioner filed a
24  habeas corpus into the county of conviction," the "writ was sent back from the county," and the
25  petition was denied on "technical error." *See id.* at 3 (internal quotation marks omitted). Second,
26  Petitioner made a blanket statement "urg[ing]" the court to find that his "right[s] . . . under the

12

1  Equal Protection Clause," among others, were violated. *See id.* at 6. Petitioner also referred to

2  his Superior Court petition, attached as Exhibit A.[6] *Compare id.* at 3 ("See: Exhibit[] A habeas

3  corpus writ, and exhibit[s]" (internal quotation marks omitted)), *and id.* at 9-34 (Superior Court

4  petition attached as Exhibit A to Court of Appeal petition), *with In re Rosenkrantz,* 29 Cal. 4th

5  616, 676, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002) (examining appellate record, "which

6  includes the pleadings and exhibits filed by the parties"), *and Hendricks v. Vasquez,* 908 F.2d

7  490, 491 (9th Cir. 1990) (recognizing district court must consider "petition and any exhibits

8  annexed to it" (quoting Rule 4, Rules Governing Section 2254 Cases) (internal quotation marks

9  omitted)).

10  On March 20, 2009, the California Court of Appeal denied Petitioner's state habeas

11  petition, but failed to address Petitioner's equal protection claim. Resp't's Answer Ex. 2, pt. 1, at

12  2. In total, the Court of Appeal stated that:

13
>  The petition for writ of habeas corpus filed on March 13, 2009, has
>  been read and considered and is denied. The August 2008 decision
14  of the Board of Parole Hearings is supported by some evidence . . .
>  , including the cruel and calculated nature of the commitment
15  offense and the callous disregard for human life it demonstrated,
>  petitioner's prior criminal history, his apparent lack of insight and
16  failure to take responsibility for his criminal acts, and his lack of
>  detailed and confirmed parole plans.

17

18  *Id.* (citations omitted).

19  Petitioner sought relief, pro se, in the California Supreme Court on April 2, 2009. *See*

20  Resp't's Answer Ex. 3, pt. 1, at 3. Petitioner filled out a form petition exactly the same as his

21

22  [6] Since Petitioner did not provide copies of his state habeas petitions, copies attached as
exhibits to Respondent's answer were reviewed. Respondent's exhibit of Petitioner's Superior
Court petition is missing the signature page with questions 12 to 18. *Compare* Resp't's Answer

23  Ex. 1, at 30-31 (Superior Court petition), *with* Resp't's Answer Ex. 2, pt. 1, at 33 (Court of
Appeal petition), *and* Resp't's Answer Ex. 3, pt. 1, at 27 (Supreme Court petition). In

24  Petitioner's Court of Appeal petition, this page appears in the exhibit of the Superior Court
petition. *See* Resp't's Answer Ex. 2, pt. 1, at 33. This page is also in Petitioner's California

25  Supreme Court petition. *See* Resp't's Answer Ex. 3, pt. 1, at 27. Other than this discrepancy,
Petitioner's Superior Court petition is the same as his California Supreme Court petition and the

26  exhibit in his California Court of Appeal petition.

1  Superior Court petition.[7]  *See id.* at 3-27.  The California Supreme Court summarily denied his

2  petition on August 26, 2009, stating only that "[t]he petition for writ of habeas corpus is denied."

3  *See* Pet'r's Pet. 8.

4      In the instant federal petition, Petitioner alleges that his rights under the Equal Protection

5  Clause were "deprived" when "Petitioner was denied[]parole, even though the time served had

6  exceeded the required punishment in the matrix (base term)."  *Id.* at 4 (internal quotation marks

7  omitted).  Accordingly, because Petitioner raised the same equal protection claim at each state

8  court level as the one before this Court, this claim is exhausted.

9          2.  Merits of the Equal Protection Claim

10     A court may dismiss a claim in a habeas application on the merits notwithstanding a

11 petitioner's failure to fully exhaust state judicial remedies.[8]  28 U.S.C. § 2254(b)(2); *Cassett v.*

12 *Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) ("[A] federal court may deny an unexhausted claim

13 on the merits where 'it is perfectly clear that the applicant does not raise even a colorable federal

14 claim.'" (quoting *Granberry v. Greer*, 481 U.S. 129, 135 (1987))).  To assert a claim under the

15 Equal Protection Clause, a petitioner must show that he was similarly situated to other

16 defendants who received preferential treatment.  *See Fraley*, 1 F.3d at 926; *see also McQueary*,

17 924 F.2d at 834-35 & n.6.  Once a petitioner makes that showing, the state would have to show

18 that its actions were rationally related to a legitimate governmental interest.  *See Harris v.*

19 *McRae*, 448 U.S. 297, 326 (1980) (holding presumption of validity attaches when distinction is

20 not based on "suspect" classification, which would trigger strict scrutiny).

21     Here, Petitioner contends that the Board's parole denial violated his equal protection

22 rights because "the time served had exceeded the required punishment in the matrix (base term),"

23

24      [7] *Supra* n.6.

25      [8] In any event, the Court must review Petitioner's equal protection claim de novo because
   the state courts failed to address it on its merits.  *See Chaker v. Crogan*, 428 F.3d 1215, 1221
26 (9th Cir. 2005), *cert. denied*, 547 U.S. 1128 (2006) (applying de novo standard of review to
   claim in habeas petition that was not adjudicated on merits by state court).

14

1 causing him to serve a disproportionate sentence. Pet'r's Pet. 4; *see supra* Part V.A.1.b.

2 California parole guidelines require setting a "base term for each life prisoner who is found

3 suitable for parole." CAL. CODE REGS. tit. 15, § 2282(a). The "base term" is "established by

4 utilizing the appropriate matrix of base terms" provided in Title 15, Section 2282 of the

5 California Code of Regulations. *Id.* In this case, Petitioner's claim lacks merit.

6      The Board did not find Petitioner suitable for parole, which is a prerequisite for setting a

7 "base term" and calculating a parole date. *Id.*; *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123,

8 1132 (9th Cir. 2006) ("The matrix is intended to ensure sentencing uniformity among those who

9 commit similar crimes. . . . Such considerations are, of course, inapplicable in the case of

10 prisoners deemed unsuitable for parole."); *see Irons v. Carey*, 505 F.3d 846, 851 n.3 (9th Cir.

11 2007) ("A 'determination of an individual inmate's suitability for parole under section 3041,

12 subdivision (b) [of the California Penal Code] must precede any effort to set a parole release date

13 under the uniform-term principles of section 3041, subdivision (a).'" (quoting *In re Dannenberg*,

14 34 Cal. 4th 1061, 1079-80, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005), *cert. denied*, 546 U.S. 844

15 (2005))); *see also* CAL. PENAL CODE § 3041(b) (The Board "shall set a release date unless it

16 determines that the gravity of the current convicted offense or offenses, or the timing and gravity

17 of current past convicted offense or offenses, is such that consideration of the public safety

18 requires a more lengthy period of incarceration for this individual, and that a parole date,

19 therefore, cannot be fixed at this meeting."). The Board "shall first determine whether a prisoner

20 is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be

21 found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will pose an

22 unreasonable risk of danger to society if released from prison." CAL. CODE REGS. tit. 15, §

23 2281(a). In other words, absent the Board's determination of parole suitability, no "base term"

24 exists. *Id.* § 2282(a). Thus, Petitioner remains subject to an indeterminate life sentence. *See*

25 *Dannenberg*, 34 Cal. 4th at 1078, 23 Cal. Rptr. 3d 417, 104 P.3d 783 ("[I]ndeterminate

26 sentencees may serve up to life in prison, but they become eligible for parole consideration after

15

1 serving minimum terms of confinement.").

2 California law does not require the Board to conduct a comparative analysis of the period
3 of confinement served by other prisoners with similar crimes. *See id.* at 1084 (holding Board
4 does not have to schedule inmate's release "simply to ensure that the length of the inmate's
5 confinement will not exceed that of others who committed similar crimes"); *see also id.* at 1091
6 (finding California regulations "nowhere indicate that the Board must determine an individual
7 inmate's suitability by reference to other offenders of the same class, or to the minimum statutory
8 term for the inmate's offense"). Nor does it expect the Board to distinguish Petitioner's case
9 from other cases in the matrix. *See id.* at 1094 n.15 (The "'matrices' are an effort to systematize
10 such comparisons to some degree," but "the decision where every single inmate's case might fit
11 on the appropriate matrix, and what aggravating and mitigating factors might distinguish it from
12 other cases in that matrix category, would require considerable new effort and judgment from
13 already overburdened hearing panels."). Instead, the Board must review the specific facts of each
14 case to make an individualized determination of whether that prisoner is suitable for parole. *See*
15 *In re Lawrence*, 44 Cal. 4th 1181, 1221, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008). Petitioner's
16 allegations, without more, fail to establish an equal protection violation. *See Williams v. Illinois*,
17 399 U.S. 235, 243 (1970) ("The Constitution permits qualitative differences in meting out
18 punishment and there is no requirement that two persons convicted of the same offense receive
19 identical sentences."). In sum, Petitioner's equal protection claim lacks merit because the Board
20 was not required to set a base term or to compare Petitioner's length of confinement or suitability
21 to that of others who committed similar crimes.

22 B. Due Process Claim

23 Petitioner also contends that the Board's decision violated his due process rights because
24 the Board incorrectly applied the "some evidence" standard. Pet'r's Pet. 4. Specifically,
25 Petitioner alleges that: (1) the Board relied "solely on the existing conviction;" (2) his
26 "institutional record was favorable;" (3) he is "58-years of age;" and (4) "recidivism is 0.02% for

16

1  returning." *Id.* (internal quotation marks omitted). For the following reasons, Petitioner's claim
2  is baseless.

3       1. Legal Standard for Due Process

4     The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives
5  a person of life, liberty, or property without due process of law. A person alleging a due process
6  violation must first demonstrate that he or she was deprived of a protected liberty or property
7  interest, and then show that the procedures attendant upon the deprivation were not
8  constitutionally sufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);
9  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

10     A protected liberty interest may arise from either the Due Process Clause itself or from
11  state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution
12  does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole
13  date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). The full panoply of rights afforded a
14  defendant in a criminal proceeding is not constitutionally mandated in the context of a parole
15  proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme
16  Court has held that a parole board's procedures are constitutionally adequate if the inmate is
17  given an opportunity to be heard and a decision informing him of the reasons he did not qualify
18  for parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). If a
19  state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that
20  parole release will be granted' when or unless certain designated findings are made," thereby
21  giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,
22  442 U.S. at 12).

23     In California, Penal Code Section 3041 sets forth the state's legislative standards for
24  determining parole for life-sentenced prisoners. Subsection (a) provides that "[o]ne year prior to
25  the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate
26  and shall normally set a parole release date . . . ." Subsection (b) provides an exception to the

1  regular and early setting of a life-sentenced individual's term, if the Board determines "that the
2  gravity of the current convicted offense or offenses, or the timing and gravity of current or past
3  convicted offense or offenses, is such that consideration of the public safety requires a more
4  lengthy period of incarceration . . . ." Based on this statute, California state prisoners who have
5  been sentenced to prison with the possibility of parole have a clearly established, constitutionally
6  protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting
7  *Greenholtz*, 442 U.S. at 12); *Irons*, 505 F.3d at 850-51 (citing *Sass*, 461 F.3d at 1128); *Biggs v.*
8  *Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

9      Additionally, as a matter of California state law, denial of parole to state inmates must be
10 supported by at least "some evidence" demonstrating future dangerousness. *Hayward v.*
11 *Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th
12 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr.
13 3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d
14 174 (2002)). California's "some evidence" requirement is a component of the liberty interest
15 created by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The
16 federal Due Process Clause requires, in turn, that California comply with its own "some
17 evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).
18 Thus, a reviewing court such as this one must "decide whether the California judicial decision
19 approving the . . . decision rejecting parole was an 'unreasonable application' of the California
20 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in
21 light of the evidence.'" *Hayward*, 603 F.3d at 562-63.

22     The analysis of whether some evidence supports the denial of parole to a California state
23 inmate is framed by the state's statutes and regulations governing parole suitability
24 determinations. *See Irons*, 505 F.3d at 851. A reviewing court "must look to California law to
25 determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then
26 must review the record to determine whether the state court decision holding that these findings

18

1    were supported by 'some evidence' [] constituted an unreasonable application of the 'some

2    evidence' principle." *Id.*

3        Title 15, Section 2281 of the California Code of Regulations sets forth various factors to

4    be considered by the Board in its parole suitability findings for life prisoners. The Board is

5    directed to consider all relevant, reliable information available regarding

> 6       the circumstances of the prisoner's: social history; past and present
> 7       mental state; past criminal history, including involvement in other
>        criminal misconduct which is reliably documented; the base and
>        other commitment offenses, including behavior before, during and
> 8       after the crime; past and present attitude toward the crime; any
>        conditions of treatment or control, including the use of special
> 9       conditions under which the prisoner may safely be released to the
>        community; and any other information which bears on the
> 10      prisoner's suitability for release.

11    CAL. CODE REGS. tit. 15, § 2281(b). The regulation also lists specific circumstances which tend

12    to show suitability or unsuitability for parole. *Id.* § 2281(c)-(d).

13        Under the applicable state regulations, factors relating to a commitment offense tend to

14    show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the

15    offense was carried out in a dispassionate and calculated manner, such as an execution-style

16    murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a

17    manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the

18    motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2281(c)(1)(A)-

19    (E).

20        Section 2281(d) sets forth the circumstances tending to show suitability which include:

> 21       (1) No Juvenile Record. The prisoner does not have a record of
>        assaulting others as a juvenile or committing crimes with a
> 22      potential of personal harm to victims.
>
> 23       (2) Stable Social History. The prisoner has experienced reasonably
>        stable relationships with others.
> 24
>        (3) Signs of Remorse. The prisoner performed acts which tend to
> 25      indicate the presence of remorse, such as attempting to repair the
>        damage, seeking help for or relieving suffering of the victim, or the
> 26      prisoner has given indications that he understands the nature and

1 | magnitude of the offense.

2 | (4) Motivation for Crime.  The prisoner committed his crime as the
result of significant stress in his life, especially if the stress had
3 | built over a long period of time.

4 | (5) Battered Woman Syndrome.  At the time of the commission of
the crime, the prisoner suffered from Battered Woman Syndrome,
5 | as defined in section 2000(b), and it appears the criminal behavior
was the result of that victimization.

6 |
(6) Lack of Criminal History.  The prisoner lacks any significant
7 | history of violent crime.

8 | (7) Age.  The prisoner's present age reduces the probability of
recidivism.
9 |
(8) Understanding and Plans for Future.  The prisoner has made
10 | realistic plans for release or has developed marketable skills that
can be put to use upon release.
11 |
(9) Institutional Behavior.  Institutional activities indicate an
12 | enhanced ability to function within the law upon release.

13 | *Id.* § 2281(d)(1)-(9).

14 | The overriding concern is public safety and the focus is on the inmate's *current*

15 | dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535 . Thus,

16 | the proper articulation of the standard of review is not whether some evidence supports the stated

17 | reasons for denying parole, but whether some evidence indicates that the inmate's release would

18 | unreasonably endanger public safety. *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

19 | 190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

20 | conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th

21 | at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

22 | 2. State Court Decision

23 | Here, because the California Supreme Court summarily denied the claim, the state court

24 | decision appropriate for review is the California Court of Appeal's decision. Under AEDPA's

25 | standards, the Court of Appeal properly held that "[t]he August 2008 decision of the Board of

26 | Parole Hearings is supported by some evidence under the clarified standard articulated in *In re*

20

1  *Lawrence* . . . and applied in *In re Shaputis*." Resp't's Answer Ex. 2, pt. 1, at 2 (citations

2  omitted). The Court of Appeal found the Board specified negative factors, in addition to those

3  related to the commitment offense, which weighed in favor of denying parole. The Court of

4  Appeal considered Petitioner's (1) commitment offense, the callous disregard for human life it

5  demonstrated, and his apparent lack of insight and failure to take responsibility for it; (2) prior

6  criminal history and, again, his apparent lack of insight and failure to take responsibility; and (3)

7  lack of detailed and confirmed parole plans. *Id.*

8                   a. Commitment Offense, Callous Disregard for Human Life It

9                     Demonstrated, and Apparent Lack of Insight

10  First, the Court of Appeal properly noted that the Board weighed Petitioner's

11  commitment offense, among other factors, when denying parole. *Id.* The Board "incorporate[d]

12  by reference the facts of the commitment offense found in the appellate court decision" and "the

13  parole report on page 2 through 4." Resp't's Answer Ex. 2, pt. 2, at 40; Parole Hr'g Tr. 12. The

14  Board also "incorporate[d] by reference" Petitioner's statement found in the "June 2006 Board

15  report pages 1 and 2, and the probation report pages 9 through 11." Resp't's Answer Ex. 2, pt. 2,

16  at 40; Parole Hr'g Tr. 12. When rendering its decision, the Board read into the record the

17  summary of Petitioner's commitment offense. Resp't's Answer Ex. 2, pt. 2, at 68-70; Parole

18  Hr'g Tr. 40-42. The Board explained its reliance, in part, on Petitioner's offense as follows:

19         This Panel, after reviewing all the information provided, we find
that this offense was carried out in a cruel manner in the fact that
20         he attempted to hijack the vehicle, kidnap the victim, and
perpetrated a robbery. The offense was carried out in a calculated
21         manner. He was there for the sole purpose of attacking a victim
which turned out to be Watkins, and attempting to carjack her
22         vehicle and take her goods, which he specifically said he planned
on it. The offense was carried out in a manner which demonstrates
23         a callous disregard for human suffering. He could have walked
away, but he did not. He continued his pursuit of the victim,
24         walked her from one part of the parking lot to the other. And the
motive for this crime was inexplicable and very trivial, robbery. . . .
25

26         The victim was vulnerable and unable to fend for herself at the
time. The offense was dispassionate . . . . [Petitioner] lied in wait

1

2

3

4

5

> and sought the victim out. Appellate court decision specifically states that there was no one else there in the parking lot at the time except for Jones and the victim. . . . The victim was in fear, great fear. He placed his hand over her mouth. The victim was unable to scream. The victim was unable to cry out in the commission of this crime. . . . He told the victim he planned on taking everything when she actually said, "Just take everything." And his statement was, "I plan to."

6 Resp't's Answer Ex. 2, pt. 2, at 70, 73; Parole Hr'g Tr. 42, 45.

7 When the Board asked Petitioner to speak of his remorse, Petitioner stated he was unable

8 to "formulate enough words" to talk about it. Resp't's Answer Ex. 2, pt. 2, at 39-40; Parole Hr'g

9 Tr. 11-12. Petitioner claimed, "[I]t's all routine as far as y'all receiving it. I choose not to be

10 redundant." Resp't's Answer Ex. 2, pt. 2, at 40; Parole Hr'g Tr. 12. But, Petitioner asserted,

11 "[T]hat doesn't mean I don't have remorse." Resp't's Answer Ex. 2, pt. 2, at 40; Parole Hr'g Tr.

12 12. Petitioner remained defensive, stating, "I wasn't the animal that I was portrayed to be. . . .

13 I'm being treated as though it was a murder. I have a kidnap/robbery." Resp't's Answer Ex. 2,

14 pt. 2, at 40; Parole Hr'g Tr. 12. Petitioner concluded, "Saying I'm sorry or being remorseful for

15 the victim and that, it's not gonna change anything other than how it is." Resp't's Answer Ex. 2,

16 pt. 2, at 40; Parole Hr'g Tr. 12.

17 At the hearing, the Board found that Petitioner "ha[d] a lack of insight into the criminal

18 offense, and he has not in this Board's opinion expressed any remorse for the victim and for the

19 crime that occurred." Resp't's Answer Ex. 2, pt. 2, at 71; Parole Hr'g Tr. 43. The Board

20 maintained that Petitioner "minimized his involvement in this crime" because he gave conflicting

21 statements. Resp't's Answer Ex. 2, pt. 2, at 71; Parole Hr'g Tr. 43. "In the probation report[,] he

22 denied ever participating in this criminal act." Resp't's Answer Ex. 2, pt. 2, at 71; Parole Hr'g

23 Tr. 43. In his "later statement," Petitioner claimed "he was going out for a jog," but no dirt

24 appeared on his shoes. Resp't's Answer Ex. 2, pt. 2, at 71; Parole Hr'g Tr. 43. In his closing

25 argument, the Deputy District Attorney pointed out Petitioner told the Board in 2001 that "he did

26 what he did" because "he was possessed." Resp't's Answer Ex. 2, pt. 2, at 59; Parole Hr'g Tr.

22

1  31. Thus, the Court of Appeal properly found that the Board weighed the nature and gravity, and
2  Petitioner's lack of insight, of Petitioner's commitment offense in his parole denial.

3              b. Prior Criminal History and Failure to Take Responsibility

4  Second, the Court of Appeal appropriately noted that the Board examined Petitioner's
5  prior criminal history and his failure to take responsibility for his criminal acts. Resp't's Answer
6  Ex. 2, pt. 1, at 2. The Board reviewed Petitioner's juvenile record, which showed that Petitioner
7  had used several names, including "Charles Hatch, Charles R. Hatch, [and] Charles Raymond
8  Hatch." Resp't's Answer Ex. 2, pt. 2, at 47; Parole Hr'g Tr. 19. On September 25, 1963,
9  Petitioner "went into the Pennsylvania Correctional and Classification Center" for armed robbery
10 and larceny. Resp't's Answer Ex. 2, pt. 2, at 48; Parole Hr'g Tr. 20. He received three to six
11 years on the armed robbery charge, and two to five years on the larceny charge, but served "about
12 18 months." Resp't's Answer Ex. 2, pt. 2, at 48; Parole Hr'g Tr. 20. Petitioner explained he was
13 "13 years of age," and "it was a strong armed robbery going into the store and stealing some
14 bologna and bread, because I was on the streets." Resp't's Answer Ex. 2, pt. 2, at 48; Parole
15 Hr'g Tr. 20. In closing, however, the Deputy District Attorney mentioned that Petitioner "gave a
16 conflicting and entirely different account to the probation officer when sentenced on this report."
17 Resp't's Answer Ex. 2, pt. 2, at 58; Parole Hr'g Tr. 30. According to the Deputy District
18 Attorney, Petitioner admitted to the probation officer that he "feigned a weapon using a plastic
19 toy gun to accomplish that robbery of that market." Resp't's Answer Ex. 2, pt. 2, at 58; Parole
20 Hr'g Tr. 30.

21 Next, the Board read into the record that Petitioner had "a 1986 parole violator [sic] for
22 armed robbery." Resp't's Answer Ex. 2, pt. 2, at 48; Parole Hr'g Tr. 20. Petitioner, however,
23 stated it was for "forgery and receiving stolen goods. No armed robbery." Resp't's Answer Ex.
24 2, pt. 2, at 48; Parole Hr'g Tr. 20.

25 Following that, Petitioner had a "U.S. Marshals bank robbery" in 1986 where he was
26 sentenced to ten years. Resp't's Answer Ex. 2, pt. 2, at 48-49; Parole Hr'g Tr. 20-21. Petitioner

23

1  felt this conviction was "political." Resp't's Answer Ex. 2, pt. 2, at 49; Parole Hr'g Tr. 21.

2  According to Petitioner, he was a "business agent" in Seattle, Washington and was the "first one

3  to have unionized the banks in the United States" at "Seattle First Bank." Resp't's Answer Ex.

4  2, pt. 2, at 49; Parole Hr'g Tr. 21. Petitioner left the union and "started a corporation called

5  Captured Time and Focus." Resp't's Answer Ex. 2, pt. 2, at 49; Parole Hr'g Tr. 21. When

6  Seattle First Bank "found out" that Petitioner "had left the union," they "froze all of [his]

7  employee's accounts." Resp't's Answer Ex. 2, pt. 2, at 49; Parole Hr'g Tr. 21. Petitioner

8  "negotiated with them for six months to release the account," but "they didn't." Resp't's Answer

9  Ex. 2, pt. 2, at 49; Parole Hr'g Tr. 21. So, "one day," Petitioner "walked in" because "everybody

10 knew [him]" and "cleaned out the vault." Resp't's Answer Ex. 2, pt. 2, at 49; Parole Hr'g Tr. 21.

11  Petitioner then "walked out" and went Hawaii, and "was gone for seven years, and had one week

12 to go before the seven years had expired." Resp't's Answer Ex. 2, pt. 2, at 49; Parole Hr'g Tr.

13 21.

14      Petitioner asserted that "when the judge looked at [his] record," he realized Petitioner was

15 "a fundraiser for Jaycees, American Legions, the Kiwanis, and all of the Lion Clubs and all of the

16 national non-profits." Resp't's Answer Ex. 2, pt. 2, at 49-50; Parole Hr'g Tr. 21-22.

17 Additionally, Petitioner "hadn't been doing anything wrong for all those years," and was

18 "legitimitely in business and helping people." Resp't's Answer Ex. 2, pt. 2, at 50; Parole Hr'g

19 Tr. 22. According to Petitioner, the judge thereby gave him ten years and "had them reduce it

20 down to two and a half years." Resp't's Answer Ex. 2, pt. 2, at 50; Parole Hr'g Tr. 22. Further,

21 Petitioner claimed to be the "first one to be on electronic monitoring in the United States."

22 Resp't's Answer Ex. 2, pt. 2, at 50; Parole Hr'g Tr. 22. Petitioner maintained he did not have a

23 gun in this robbery. Resp't's Answer Ex. 2, pt. 2, at 50; Parole Hr'g Tr. 22.

24      On June 14, 1990, Petitioner had a "DWI arrest, driving while intoxicated," in West

25 Covina, California. Resp't's Answer Ex. 2, pt. 2, at 50-51; Parole Hr'g Tr. 22-23. Petitioner

26 received "two years probation and a 30 days jail fine." Resp't's Answer Ex. 2, pt. 2, at 51;

1 Parole Hr'g Tr. 23. Thereafter, the Board mentioned, "[i]n 1996, 14601, unlicensed driver."

2 Resp't's Answer Ex. 2, pt. 2, at 51; Parole Hr'g Tr. 23.

3 Afterward, Petitioner "had a warrant on July 1, 1997." Resp't's Answer Ex. 2, pt. 2, at

4 51; Parole Hr'g Tr. 23. Petitioner explained that it was "from the DUI," where he was placed on

5 "probation that had expired." Resp't's Answer Ex. 2, pt. 2, at 51; Parole Hr'g Tr. 23. Thus,

6 "[t]he probation had expired," but there was still a warrant "in the computer" for him. Resp't's

7 Answer Ex. 2, pt. 2, at 51; Parole Hr'g Tr. 23.

8 When rendering its decision, the Board stated:

9
10
11

> Another suitability factor is that this inmate has an escalating
> pattern of criminal conduct that includes violence. He has failed
> previous grants of probation and prison commitments, that includes
> county jail, adult probation, and juvenile probation. He's been
> convicted of robbery and burglary, and that includes bank robbery.

12 Resp't's Answer Ex. 2, pt. 2, at 71; Parole Hr'g Tr. 43. The Court of Appeal, therefore,

13 appropriately found that the Board reviewed Petitioner's prior criminal history and his failure to

14 take responsibility for his criminal acts.

15 c. Lack of Detailed and Confirmed Parole Plans

16 Finally, the Court of Appeal properly affirmed the Board's determination that Petitioner

17 lacked detailed and confirmed parole plans. Resp't's Answer Ex. 2, pt. 1, at 2. When asked

18 about residence if paroled, Petitioner declared, "My dad has made me an allowance I can live

19 with them" in Colorado. Resp't's Answer Ex. 2, pt. 2, at 44; Parole Hr'g Tr. 16. Petitioner

20 added, "[O]f course they have a lot of property," and "would support me until I got on my feet."

21 Resp't's Answer Ex. 2, pt. 2, at 44; Parole Hr'g Tr. 16. Petitioner also commented, "I've not

22 been with my father or mother for a number of years, and I want to spend a little time with them

23 before they pass away." Resp't's Answer Ex. 2, pt. 2, at 44; Parole Hr'g Tr. 16. However,

24 Petitioner failed to provide any letters of support because "his dad had gotten so distraught" the

25 last time he was not paroled, and Petitioner did not want to "frustrate him." Resp't's Answer Ex.

26 2, pt. 2, at 45; Parole Hr'g Tr. 17. The Board reminded Petitioner, however, that "every parole

25

1 Board is different. . . . I've never met you 'til today. . . . I can only go by what is presented in
2 front of me. . . . I think you know that." Resp't's Answer Ex. 2, pt. 2, at 46; Parole Hr'g Tr. 18.

3 Petitioner also lacked vocational training and employment plans. Petitioner explained
4 that because he was "locked down for all the years in the desert in Calpatria Settlement Farm," he
5 did not have an opportunity to pursue vocational training. Resp't's Answer Ex. 2, pt. 2, at 34;
6 Parole Hr'g Tr. 6. Petitioner compared Calpatria to "Vietnam" where "you're locked up 90% of
7 the time." Resp't's Answer Ex. 2, pt. 2, at 54; Parole Hr'g Tr. 26. Nevertheless, Petitioner
8 deemed his education as "suitable." Resp't's Answer Ex. 2, pt. 2, at 35; Parole Hr'g Tr. 7.

9 Petitioner then "got to Chuckwalla," where he pursued a "business technology vocation."
10 Resp't's Answer Ex. 2, pt. 2, at 35; Parole Hr'g Tr. 7. This involved "typewriting to accounting
11 to computers and so forth." Resp't's Answer Ex. 2, pt. 2, at 54; Parole Hr'g Tr. 26. According
12 to Petitioner, he "was in it successfully for up to a year" until it "ubruptly [sic] closed." Resp't's
13 Answer Ex. 2, pt. 2, at 35; Parole Hr'g Tr. 7.

14 Petitioner was then sent to "CMC," where he asserted that he was assigned as a "posting
15 clerk for the administration." Resp't's Answer Ex. 2, pt. 2, at 35, 55; Parole Hr'g Tr. 7, 27.
16 Then, there were "problems in the mini canteen," Resp't's Answer Ex. 2, pt. 2, at 55; Parole Hr'g
17 Tr. 27, so he was assigned as "canteen manager." Resp't's Answer Ex. 2, pt. 2, at 35; Parole
18 Hr'g Tr. 7. Since these were both, "unfortunately," "administrative positions," Petitioner
19 pursued a "showers job." Resp't's Answer Ex. 2, pt. 2, at 55; Parole Hr'g Tr. 27. Petitioner
20 informed the Board that he "still do[es] have work[] in the shower." Resp't's Answer Ex. 2, pt.
21 2, at 35; Parole Hr'g Tr. 7. Petitioner reasoned that he was unable to procure a "suitable
22 vocation, you know, for y'all, not because [he] didn't try and pursue it," but because he "never
23 had the opportunity." Resp't's Answer Ex. 2, pt. 2, at 56; Parole Hr'g Tr. 28.

24 Ultimately, Petitioner stated that being a paralegal was his "primary" goal "because of the
25 firm" and his "love for law at this point." Resp't's Answer Ex. 2, pt. 2, at 44; Parole Hr'g Tr. 16.
26 Petitioner claimed he would be able to accomplish this, "but it cost $840," and he "get[s] paid

26

1  $.80 cents an hour." Resp't's Answer Ex. 2, pt. 2, at 56; Parole Hr'g Tr. 28. And, Petitioner

2  commented, "I don't ask my people or nobody for anything." Resp't's Answer Ex. 2, pt. 2, at 56;

3  Parole Hr'g Tr. 28. But, Petitioner declared, "I'm a have to just break down and ask somebody,

4  you know, to help." Resp't's Answer Ex. 2, pt. 2, at 56; Parole Hr'g Tr. 28.

5       The Board, therefore, found that Petitioner "lacks realistic parole plans." Resp't's

6  Answer Ex. 2, pt. 2, at 72; Parole Hr'g Tr. 44. When rendering its decision, the Board first noted

7  that Petitioner did not have "viable residential plans in the last county of legal residence."

8  Resp't's Answer Ex. 2, pt. 2, at 72; Parole Hr'g Tr. 44. The Board also recognized that

9  Petitioner lacked "any verifiable place of residence, nor any letters of support." Resp't's Answer

10  Ex. 2, pt. 2, at 72; Parole Hr'g Tr. 44. Additionally, the Board observed that Petitioner did not

11  have "acceptable employment plans." Resp't's Answer Ex. 2, pt. 2, at 72; Parole Hr'g Tr. 44.

12  Thus, the Court of Appeal appropriately verified the Board's finding that Petitioner failed to have

13  detailed and confirmed parole plans.

14       In sum, the Court of Appeal reasonably concluded that the Board's decision was

15  "supported by some evidence" because of "the cruel and calculated nature of the commitment

16  offense and the callous disregard for human life it demonstrated, petitioner's prior criminal

17  history, his apparent lack of insight and failure to take responsibility for his criminal acts, and his

18  lack of detailed and confirmed parole plans." Resp't's Answer Ex. 2, pt. 1, at 2. These factors

19  demonstrate a nexus between the facts in the record regarding Petitioner's commitment offense,

20  which the Board may accept as proven and true, and the ultimate conclusion that Petitioner still

21  posed a risk of danger or threat to the public. These factors also independently demonstrate some

22  evidence in the record that Petitioner was not suitable for parole. The Court of Appeal, therefore,

23  properly concluded that the Board's decision withstands the minimally stringent "some

24  evidence" test and has not violated Petitioner's right to due process of law.

25                                    VI. CONCLUSION

26       For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

1  application for writ of habeas corpus be DENIED.

2      These findings and recommendations are submitted to the United States District Judge
3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one
4  days after being served with these findings and recommendations, any party may file written
5  objections with the court and serve a copy on all parties. Such a document should be captioned
6  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
7  shall be served and filed within seven days after service of the objections. Failure to file
8  objections within the specified time may waive the right to appeal the District Court's order.
9  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57
10 (9th Cir. 1991). In any objections he elects to file, Petitioner may address whether a certificate of
11 appealability should be issued in the event he elects to file an appeal from the judgment in this
12 case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or
13 deny certificate of appealability when it enters final order adverse to applicant).

14 DATED:    September    , 2010.

17                    TIMOTHY J BOMMER
                      UNITED STATES MAGISTRATE JUDGE

28